Fuchsberg, J.
(dissenting). I must respectfully disagree with the majority’s conclusions, for I believe they fail to take account of the central issue in this case. The problem before us is not merely whether the New York Public Library is a sufficiently public entity to be labeled a "public employer” or even whether, in the abstract, the statutory authorization permitting the Public Employment Relations Board (PERB) to denominate certain employers as "joint employers” (Civil Service Law, § 201, subd 6, par [b]) covers such an amalgama *754 tion of the City of New York and the library as was attempted here. As I see it, the real problem arises out of a jurisdictional battle between two governmental agencies, PERB and the New York State Labor Relations Board (SLRB), each charged with regulation of labor relations within the State. And the question we ought to address is whether, given the extensive involvement of the city in the labor relations of the library, it is appropriate to permit the SLRB to retain jurisdiction over the latter’s labor relations, thereby, in effect, authorizing the SLRB to direct and supervise the city’s participation in library employee relations. Even more substantively, is it appropriate to provide library employees all advantages and disadvantages of government employment but exempt them from the system of labor relations designed for such employment? I conclude that it is not.
The question was initially raised when Richard M. Brower, a library employee, asked PERB to declare the "agency shop” agreement between the library and its union, District Council 37, unenforceable, agency shops being permissible under the aegis of the SLRB, but not under the provisions of the Taylor Law (Civil Service Law, art 14). After initially rejecting the complaint on the grounds that it lacked jurisdiction, after hearing a petition from the city that its decision be reconsidered, PERB, which may only make such a determination upon application by a "government” (§ 201, subd 6, par [b]), found the city to be a joint employer with the library and that it, therefore, did have jurisdiction.
In making that determination, PERB was authorized by statute as follows: "(b) Upon the application of any government, the board may determine that the applicant shall be deemed to be a joint public employer of public employees in an employer-employee negotiating unit determined pursuant to section two hundred seven of this chapter when such determination would best effectuate the purposes of this chapter.” (§ 201, subd 6, par [b].)
Though, as the facts show, the city in fact overwhelmingly controlled the library’s labor relations, it is to be noted that a "government” is not required to be a sole but merely a "joint” public employer, that there is no restriction on whether the "employer-employee negotiating unit” is to be governmental or nongovernmental in character, and that a wide interpretive discretion is reposed in PERB by empowering it to decide *755 what "determination would best effectuate the purposes” of the statute.
Before applying these provisions, it is useful to note the special relationship existing between the city and the library which, when brought to its attention by the city, PERB had to recognize. It starts from the history of the library’s inception as an entity.
By a series of legislative enactments, three separate private trusts established to provide library services to the City of New York for the free use of all its people were incorporated; the enactments authorized the trusts to accept bequests from John Jacob Astor, James Lenox, and Samuel J. Tilden. The "New York Free Circulating Library”, an entity of the city itself, was also established by statute, and, at a later date, again by statute, all were merged into one. Under that law, the city was authorized to erect the main library building and to enter into agreement with the library permitting its use and occupation for as long as was free. The same agreement also provided that the city should supply funds for its maintenance and operation. And New York City’s Mayor was granted the power to appoint and remove the library’s trustees. Thereafter, Andrew Carnegie’s offer to pay for the erection of branch libraries led to further legislation authorizing the city to acquire library sites by gift, purchase or condemnation and to maintain the buildings after their construction; that legislation also provided that "amounts required for such maintenance shall constitute a city charge to be provided for in the annual budget and tax levy of said city.” (L 1901, ch 580, § 3.)
The city and the library entered into the arrangement permitted by the legislation. It is the foundation of their relationship today. Even as viewed by its creators, the relationship is at least a joint one, envisioning mutual responsibilities, public benefits, and great dependency on city tax levies. That dependency now results in the city providing some 80% of the library’s operating costs. Most of the books are owned by the city; most of the employees’ salaries, the largest budget item, are paid by it. Of the remaining 20% of operating funds, the bulk are State and Federal, not private.
In applying for city funds, the library is subject to the same controls applicable to conventional city departments. It must supply performance standards to justify the number of employee hours for which it seeks reimbursement. It submits its *756 budget through the Department of Parks, Recreation and Cultural Affairs and defends it, in the same fashion as are other city budget items, at hearings before the city budget director. During that process, budget cuts are imposed on the library as on other agencies and they directly affect employee levels and salaries.
Perhaps even more precisely pertinent to this case, the union to which the library’s employees belong bargains directly with the city. The library, although the provisions of its original agreements with the city theoretically leave managerial decisions in its hands, does not even participate in the negotiations. Through them, the library employees who are paid with city funds have won the right to participate in the city pension program, the right to the same insurance and fringe benefits as other city employees receive, the right to the benefit of the classification system applied to all city employees and the right to receive the same salaries as do all other city employees in these classifications. These arrangements have not come about by default. The library has agreed that it will abide by city decisions as to salary levels and benefits resulting from collective bargaining negotiations. In fact, the negotiations conducted on behalf of library employees are not conducted separately, but as part and parcel of the negotiations for all city employees similarly classified. Nor does the library pay any negotiated increases until the city agrees to fund them.
The nonsalary terms and conditions negotiated between the union and the city are incorporated in the employees’ contract with the library. The payroll of the library must be certified to the city so that it may keep tabs on whether the salary and benefit programs are lived up to. Since the library extends the benefits won by its city-paid employees in their negotiations to the small number of its employees paid by other governmental and private funds, the labor relations with the city set the pattern for all. The library is even subject to the city’s "hiring freeze” in its filling of vacant positions and its promotions of library employees. Shift differentials, meal allowances and overtime are determined similarly. And the city pays for the library’s employees’ contributions to the welfare fund.
It is manifest, then, that the city’s involvement in the library’s employee relations added up to a very high, well-nigh complete, incidence of control over the terms and conditions of employment and to an equal degree of integration of the *757 library’s employee relations program into that of the city as a whole. Those are the classic factors considered in determinations of joint employership, and while cases settled under the national labor statutes are not binding on PERB, there is no reason why, in a conceptual context, they should not be highly persuasive. (See NLRB v Greyhound Corp., 368 F2d 778; Boire v Greyhound Corp., 376 US 473; NLRB v Jewell Smokeless Coal Corp., 435 F2d 1270; Herbert Harvey, Inc. v NLRB, 385 F2d 684; NLRB v Gibralter Ind, 307 F2d 428.) Ergo, PERB’s conclusion that the city was in fact a joint employer is not only well-founded but unavoidable. That it was statutorily authorized as well is equally clear for the following reasons:
It is important to note at the outset that PERB, correctly I submit, did not find it necessary to reach the question of whether the library is, by itself, a public employer. That is not at the heart of the issue before us. The public function of the library and its relationship to the city needed to be considered, and needs to be here, only to the extent that the factors tending toward the establishment of a public function demonstrate the uniqueness of the library-city relationship and its effect in devolving the status of joint employer on the city. In fact, for the reasons stated in Mr. Justice Tilzer’s thorough opinion below, I also find that the statutory definitions of "public employers” found in the Taylor Law do not include the library; technically it is, unlike the city, neither a public benefit corporation nor an agency exercising governmental power (see Civil Service Law, § 201, subd 6, par [a]), although it in some ways approaches being either or both of those things. Let us, then, assume it is a private employer, but a unique one, and having made that assumption, turn to the determination of whether PERB is statutorily authorized to find a joint employership between the city and a private employer on the facts in this case.
In doing so, we find ourselves in an uncharted sea where few litigated cases and few determinations involving the joint employership phrase in the statutory section can be found.* Those which PERB has made to date have involved only employers whose governmental status was unquestioned. (See, particularly, Matter of County of Ulster v CSEA Unit, 37 AD2d 437.) Nothing in the Ulster case, however, is inconsist *758 ent with a finding of joint employership between a private entity and, most assuredly, a "government”, where that "would best effectuate the purposes” of the Taylor Law.
It can, of course, be argued that the employees must also be public; as I read the statute, however, it authorizes that the government applying "shall be deemed to be a joint public employer of public employees”. (Emphasis added.) The employees involved, in other words, need not have been identified as public prior to the determination authorized here, it being for the board to consider and "determine” whether the library employees may be so denominated.
Further, a fair reading of PERB’s statutory authorization to determine "joint employers” includes public-private relationships, particularly so when the dominance of the public agency is as clear as it is here. It would be anachronistic in the extreme, at a time when the quasi-independent agency, legislatively structured and supported by government, has become a common vehicle for State and city activity, and where proliferation of public employment in and out of such agencies has been accompanied by experimentation with new means of dealing with their labor relations — as witness this very statute and PERB itself — for a different interpretation to prevail.
It remains only to ask whether, as a matter of general legislative policy, the choice of PERB over the SLRB is permissible or wise. I believe that it is. The SLRB, as amicus curiae, urges us to interpret the Taylor Law, based on its legislative history, as a narrow exception to the SLRB’s own broader mandate. (L 1937, ch 443.) It argues that the extensive references in that legislative history to civil service employees and to government employees indicates an intent to so limit the coverage of the law, though no such intent is anywhere expressed. To the contrary, I find that a persuasive reason to hold that, where employee relationships are so dominated by governmental control and influence as they are in this case, the legislative intent would be better effectuated by vesting jurisdiction in the agency created to deal with the special nature of governmental employment than by leaving regulation, such as in the case of the library, to an agency set up to administer laws applicable to essentially private employment relationships. The National Labor Relations Board (NLRB), whose statutory mandate (US Code, tit 29, § 151 et *759 seq.) is very similar to the SLRB’s, recently concluded that it was an inappropriate agency to supervise employment relationships at one of the branches of the New York Library, based on precisely the same city involvement PERB found here. (Matter of Queensboro Public Lib., 195 NLRB 974.)
Procedurally, we note, with regard to the genesis of PERB’s determination here, that, construed most broadly, PERB’s authority to determine appropriate units for bargaining purposes under section 207 includes the question of who is the proper employer for a given unit of employees. That PERB’s determination here was provoked by an improper practice charge would not mean, therefore, that it was made outside of, or in contravention of the standards set forth in section 207. Further, once the city applied for the reconsideration of the jurisdictional question, the issue was met head on.
Finally, a word about the employees themselves. For all practical purposes, they are now already city employees. The question merely is which governmental agency and which statute is to govern their labor relations. Is it to be PERB, whose very raison d’etre is regulation of such relations, or SLRB, an agency not so oriented? Needless to say, there are both benefits and burdens involved in attaining the status of public employees. Whether the Taylor Act belongs on the benefit side or the burden side, the Legislature has decided that that is the best way to achieve and maintain a fair balance of labor relations rights between employees and a governmental employer. We should not upset that balance.
Accordingly, I would reverse the decision below and remit the case to PERB for such further determinations as it may find necessary.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur in memorandum; Judge Fuchs-berg dissents and votes to reverse in a separate opinion.
Judgment affirmed.

 My research discloses not a single reported instance of reported joint-employer determinations by any other States. The question is thus very much one of first impression.